UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,                           CASE NO. 3:12cr76-LAC

vs.

JAY ODOM,

    Defendant.
_____/

## SENTENCING MEMORANDUM OF JAY ODOM

    Defendant Jay Odom, through the undersigned counsel, submits this memorandum to assist the Court in imposing sentence in this case.  On February 12, 2013, the defendant appeared before the Court and entered a plea of guilty to one felony count of causing a false statement to be made to the Federal Election Commission.  Sentencing is scheduled for April 23, 2013.

    Mr. Odom acknowledges that he is guilty of the charged offense.  This memorandum is not an effort to avoid responsibility for Mr. Odom's actions or to minimize his wrongdoing.  Instead, the purpose is to explain in more detail the mitigating factors we ask the Court to consider.

    No objections were filed to the Presentence Report ("PSR"), or the probation officer's calculation of the advisory sentencing guidelines that result in a total offense level of 10.  The advisory sentencing range for an offense level of 10 is 6-12 months.  Because that offense level is within zone B of the Sentencing Table, there are numerous sentencing options available to the Court other than imprisonment.

    Mr. Odom respectfully requests that the Court impose a sentence of probation without confinement or home detention.  As will be explained below, this sentence is clearly justified based upon a consideration of the statutory factors set forth in 18 U.S.C. § 3553(a).

Mr. Odom has no prior convictions.  Although he was charged in a political prosecution involving the Speaker of the Florida House of Representatives, the State ultimately nolle prosequied that case during trial when it became obvious the trial judge was going to rule that no crime occurred.  His record is otherwise unblemished.

**I.     Mr. Odom's Background.**

Mr. Odom is submitting numerous character letters[1] for the Court's consideration.  These character letters provide an in-depth look at Mr. Odom's relationship with his family and his contributions to the community.  One of the letter writers, Joan Strewler-Carter, succinctly summarized the message the Court will receive from reading the character letters, when she said:

> **"We believe that [Mr. Odom] is a good man, father, son, employer, friend, and community leader. . . . We need people like Jay Odom who willingly contribute to their families, success of local businesses, nonprofits along the Emerald Coast, and our communities in general . . ."**

**A.     Family History.**

Mr. Odom is 57 years old.  He was born in Japan while his father was serving in the U.S. Air Force.  He is the second of five children of the marriage of Emily and J.G. Odom.  Mr. Odom's father died last year.  His mother is 84 years old and in poor health.  Mr. Odom's parents were middle class people who believed in family and hard work.  According to his siblings, Mr. Odom is the present day patriarch of the family and has "taken care of all of us."  He has "always taken care of our parents."  PSR at ¶ 93.

Mr. Odom has been married twice.  There were two children born of Mr. Odom's second marriage: Spencer, age 10; and Slater, age 9.  When Mr. Odom's second marriage ended in divorce,

---

[1]Character letters are being submitted to the Court in a separate bound notebook, with copies to the probation officer and the government.  Some of those character letters will be referred to and quoted in this memorandum.

Mr. Odom and his wife agreed to a 50-50 custodial parenting relationship. As a result, since the divorce in 2009, Mr. Odom has had primary custody of his two sons every other week. A large number of character letters comment on the extremely close relationship Mr. Odom has with his children. For example, good friend Kevin Mason writes:

> **"Jay is deeply committed to his family, raising his boys a majority of the time as a single father. He always finds time for his family and has been highly engaged in all their activities such as soccer, basketball, cub scouts and many school activities. I have heard Jay say numerous times that he hopes his biggest legacy in life would be that he was the BEST father Spencer and Slater could have ever had." [Caps. in orig.]**

Mr. Odom's neighbor, Frankie Gibbs Peale, wrote:

> **"You will not find Jay yachting, fishing, golfing, or world traveling, but without a doubt you will see Jay with his boys. I have so many fond memories of Jay in the summer, in his small boat, pulling his sons on a water tube or skis in Joe's Bayou. Jay has always come home from work to make dinner for his boys and help with school work. He eagerly attends his kids' school and sporting events. My husband and I have always said he is the best dad we have ever known."**

Barbara Brown, Spencer and Slater's former teacher and present-day nanny, referred to Mr. Odom as a "super dad," and said:

> **"Whenever any special event was going on at school Mr. Odom was right there supporting and cheering his boys on or being a chaperone at one of their field trips. . . . Mr. Odom is a committed family oriented person who never misses the opportunity to be with his sons. He continues to attend their school functions and afterschool activities such as karate and basketball."**

Indeed, Mr. Odom means a lot to his family and his family means a lot to him. He has made it his life goal to be the best possible father he could to his two sons.

### B. Work History.

Mr. Odom received a B.S. degree in Ocean Engineering in 1979. After graduation, Mr. Odom worked in the oil industry for a few years and then began a career in real estate in Austin, Texas. After a short time, he decided to return to Florida, where he has become a successful real

estate developer. Mr. Odom has 11 major housing developments to his credit and owns numerous commercial shopping centers and office buildings. One of Mr. Odom's visionary development ideas was to lead an effort to revitalize a major commercial area in Fort Walton Beach. To that end, he purchased and renovated numerous properties, one of which was a deteriorated shopping center. That shopping center is now called Uptown Station and has become a vibrant showpiece for revitalization of the area.

Mr. Odom's developments have been a significant economic engine for northwest Florida's economy. Mr. Odom currently has 3 major projects in various stages of completion. He employs 29 full time employees, with an annual payroll in excess of $1 million. Over a five year period, starting in 2007, his companies paid out over $22 million to subcontractors and vendors who employ hundreds and possibly thousands. His real estate tax bills over the same five year period were over $5 million.

His impact on the local economy and local business is confirmed by several character letters submitted by local business owners. For example, Laverne M. Young of Young's Contracting writes:

> **"Over the years [Mr. Odom's] projects in Destin, Freeport and Ft. Walton Beach have provided first class homes and shopping for the residents of Okaloosa and Walton County. Through his developments our company alone was able to grow our workforce from a dozen employees up to ninety-seven at the peak of our relationship. My employees and I appreciate the opportunity to create jobs and improve the community for the residents and visitors that spend their time and money here."**

Amy Stoyles of Archiscapes, LLC, a small architectural firm, said:

> **"Not many people are inclined to take a chance on a new business, especially when it comes to designing residential and commercial projects that are huge investments for their family or business. But Jay saw something in us and trusted us. . . . Jay not only had projects for us in the down economy, which helped save our business, but has always been good on his word. When he signs**

> **a contract, we can count on him to follow it. He always pays us immediately when we do our work. We cannot say enough kind things about Jay."**

Fritz and Susan Herrington, who own a commercial construction company, summarized it as follows:

> **"We have been working with [Mr. Odom] on many construction contracts since [2006]. He has helped keep our company alive and vibrant through these contracts and we learned that his was one of the best we had ever worked with. . . . We were always paid on time and felt a great respect for Mr. Odom because he was diligent in all aspects of our relationship. . . . He keeps many, many people in our communities in business through his companies and is a valued and respected visionary."**

In short, Mr. Odom has made a major contribution to the local citizens with an immeasurable trickle down effect that reaches many small businesses and provides local jobs.

### C. Service to the Community.

Mr. Odom has a strong commitment to his community, to our military personnel, and to those in need. He has given back at every conceivable level from making charitable contributions to providing one-on-one assistance to persons in need. To detail all of his community based activities would exhaust the page limit of this memorandum. The character letters probably say it best as the writers explain what Mr. Odom has done for them, for their organizations, and for other people they know.

For example, the letter written by Bill Robinson, President of the United Way, confirms that Mr. Odom: 1) developed and built a computer classroom at Destin Elementary School and, when funds ran short, "Jay made a personal donation to insure the success of the project;" 2) donated the funds to purchase three vans that went to three of the agencies served by the United Way; and 3) provided facilities rent free for the Habitat for Humanity for over 8 years.

Mr. John Russell, the President of the Destin Charity Wine Auction Foundation that raises

money for children's charities, confirmed that "Mr. Odom has been a very staunch supporter of our foundation." Mr. Odom donated jet service to be auctioned off by the foundation and purchased several auction items totaling $13,000.

Amanda Wilkerson, the Executive Director of the Emerald Coast Wildlife Refuge said she first met Mr. Odom "in 2004 when he became a generous private donor to the Refuge." He has authorized the Refuge to release rehabilitated wildlife, such as hawks and eagles, on his land. In addition, Mr. Odom permits the Refuge to use space in Uptown Station each year to conduct a fundraiser that brings in nearly one-half of the Refuge's annual operating expenses.

Alexis Tibbetts, of the Okaloosa County School District, writes about Mr. Odom purchasing scholarships for the statewide Take Stock in Children Program each of the last 8 years. That program provides scholarships for deserving students who academically could do college work, but otherwise could not afford a four year education. In addition, Ms. Tibbetts comments on Mr. Odom's efforts in setting up the computer lab referred to above by saying, "he paid for and established a computer lab at Destin Elementary School complete with hardware, software and wiring infrastructure before technology was a requirement in schools."

Marti Gardner, the Principal at Destin Elementary School, talks about Mr. Odom providing funding for: 1) entire grade levels to go on field trips; 2) the school wide "Say No to Drugs – Anti-Bullying" program; 3) food drives for needy families; and 4) to put additional technology resources in the students' hands. Ms. Gardner said:

> **"Generally he is not one you have to ask; he just steps up and says 'what can I do?' He prefers not to be recognized for his generosity nor does he expect preferential treatment. From a principal's perspective I wish more parents were like Mr. Odom."**

These are just a few of Mr. Odom's charitable activities. Some of the things he has done for

individuals in crisis are even more compelling. For example, Emily Gregory said that Mr. Odom:

> **"[I]s a man of great compassion for other human beings, especially those in need. One specific donation touched my heart more than he knows. My best friend's husband of 24 years was in his final days of a three year battle with colon cancer. Jay gave their family $5,000 so she could stay at home with him instead of working. It was more than just a donation of money; it was an irreplaceable moment in time that would have never been possible without his kindness."**

April Wilson wrote:

> **"Jay helped me and my family many, many times. One that stands out in my mind is when my brother was dying in California. I didn't have the money to fly to California and be with my family during this difficult time. Jay paid for me to fly and be with him and my family during his final days. Words can't describe how grateful I am to have Jay as a friend."**

Mr. Odom's community service sometimes appears in other ways besides directly helping others. Following the 911 attacks in 2001, Mr. Odom honored the military and first responders by erecting Florida's highest flagpole in their honor. Martin Owen, Mr. Odom's marketing and advertising director, described what happened when it was time to dedicate the flagpole:

> **"On completion, my plan was to have an event to dedicate the pole and to promote the property at which it was located. Jay Odom was happy to have a ceremony but did not want to participate personally and wished the event to be for the military and first responders. Following the dedication we arranged 6 flag raising ceremonies each year for the local community and involving the police and fire departments. Jay always resisted any personal involvement or self promotion, and insisted that these were community rather than business promotion[s]."**

There are many other examples of Mr. Odom's commitment to the community that are discussed in the character letters   While Mr. Odom has been very successful in his business endeavors, he has never forgotten to give back.

II.     **Sentencing Analysis**

Since the sentencing guidelines are no longer mandatory, but advisory, *United States v.*

*Booker*, 543 U.S. 220, 245-46 (2005), the sentence to be imposed in this case is entirely in the hands of this Court. We request the Court impose a probationary sentence without confinement or home detention upon the grounds that such a sentence is appropriate based on the sentencing factors in 18 U.S.S.C. § 3553(a) and "reasonable" under *Booker*, 543 U.S. at 261-62.

### A. Advisory Sentencing Guidelines.

As noted above, neither Mr. Odom nor the Government filed an objection to the PSR. The total offense level of 10 results in an advisory guideline range of 6-12 months, but since that range is in Zone B, the guidelines authorize a sentence other than incarceration. Under the guidelines, the Court is authorized to substitute home detention or community based confinement for incarceration. While Mr. Odom agrees with the guideline calculation, we submit that a sentence of probation without home detention or community confinement is more appropriate based upon consideration of the sentencing factors in 18 U.S.C. § 3553(a).

### B. Application of Sentencing Factors in 18 U.S.C. § 3553(a)

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," and sets forth a number of factors[2] the Court should consider in imposing sentence:

> **1. The nature and circumstances of the offense and history and characteristics of the defendant.**

Mr. Odom understands what he did was wrong, but he had no genuine appreciation for the consequences that could result. As Mr. Paulzak stated about his own involvement in the situation, "[I] never thought of it as illegally reimbursing campaign contributions because everyone did it."

---

[2] Not all § 3553(a) factors are discussed here because some are not applicable, e.g. the need for restitution.

-8-

PSR at ¶ 31.  Other conduit contributors said essentially the same thing; for example, one contributor stated that, "reimbursing campaign contributions was common and occurred in federal, state, and local elections all the time."  PSR at ¶ 20.  "Everyone did it" is not a defense, nor does it mitigate the offense, but if this behavior was as pervasive as these people suggest, it underscores the fact that those involved may not have fully appreciated the seriousness of the offense.

Mr. Odom, as discussed above, is a self-made businessman who is a major contributor to the economic well-being of the local community.  He has been the driving force behind numerous projects that have provided jobs and paid real estate taxes to the benefit of the community.  In addition, he has done many thoughtful and charitable acts, most of which were totally unsolicited.  Finally, Mr. Odom is entirely devoted to his sons and, as a divorced father, he provides care for his sons every other week.  They are the top priority in his life.

These circumstances, when coupled with Mr. Odom's lack of criminal history, mitigate toward a sentence of probation without confinement or home detention.

**2.    The need for the sentence to reflect the seriousness of the offense and promote respect for the law.**

Without attempting to excuse or minimize Mr. Odom's wrongful behavior, his conduct in this case is surely in the low range of "seriousness" in the broad spectrum of federal crimes.  This is an election law violation – not a crime against a person, child pornography, drug trafficking, or one of the many other serious crimes this Court must address.

Having been through this type of criminal investigation and the resulting charges will surely solidify Mr. Odom's resolve to respect the law and avoid putting himself in this untenable situation in the future.

      **3.**      **The need to afford adequate deterrence to criminal conduct.**

A probationary sentence will be sufficient to deter others from making the mistakes Mr. Odom admits he has made. Media reports have made this case known to the public and the publicity alone will deter other similarly situated individuals from making the same mistakes. Should the Court grant our request for a probationary sentence, Mr. Odom's prosecution will serve as a sober reminder to others to scrupulously avoid similar conduct. As noted above, others who participated in conduit campaign contributions apparently did not realize the consequences that could result from their participation. Mr. Odom's prosecution and the resulting publicity has changed all that. The local community now knows the wrongness, as well as the criminality, of such conduct.

      **4.**      **The need for the sentence to adequately and reasonably protect the public from further crimes of the Defendant.**

Mr. Odom has no previous convictions and has no record of violence or substance abuse. He is no danger to the public. In addition, the circumstances that led to Mr. Odom's involvement in the conduit contributions were not of a nature to suggest he will engage in such conduct again. There is no risk Mr. Odom will repeat his offense or commit further crimes.

      **5.**      **The Sentence Will Provide the Defendant With Needed Educational Training, Medical Care, and Other Correctional Treatment in the Most Effective Manner.**

Mr. Odom needs medical care for the conditions identified in the PSR. He needs to be able to continue treatment with his doctors who have been seeing him weekly over the last four years. That treatment requires medication with constant monitoring and adjusting for his diagnosed conditions. Simply put, his medical needs would be best-served by continuing to live at home and being able to continue to visit his doctors on a regular basis. The same type of treatment and monitoring of specialized medications would not be available to him in a custodial setting.

### 6. The Types of Sentences Available.

Probation without community confinement or home detention is clearly an available sentence that may be imposed in this case. The Court is not constrained by the advisory sentencing guidelines to impose incarceration or to require intermittent confinement, community confinement, or home detention as a condition of probation. Instead, the only constraint on the Court is that the sentence must be "reasonable," under *Booker*, 543 U.S. at 261-62. We submit that probation without confinement or home detention is, in fact, "reasonable" and therefore consistent with *Booker*.

### 7. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Importantly, the Court should impose a sentence in this case that does not create a disparity with other defendants prosecuted under similar circumstances. Here, there is compelling precedent in favor of imposing a probationary sentence on Mr. Odom. Indeed, only last month a similar (but more aggravated) case was before the Middle District of Florida and the defendant was sentenced to probation with no home detention or other confinement. *United States v. Mobley*, Case No.: 3:12-CR-150-J-99TJC-JBT. In *Mobley*, the defendant pled guilty to two felony violations of the Federal Elections Law: Count 1 – Making Campaign Contributions in the Name of Another, and Count 2 – Using Corporate Funds to Make Campaign Contributions.[3] See Judgment and Sentence (Exh. A). Defendant Mobley was likewise a prominent real estate developer who unlawfully reimbursed campaign contributions that were made by his employees and others. The counts of conviction

---

[3] Although Mr. Mobley's crime of conviction was not a section 1001 violation, it is virtually impossible to imagine a scenario involving a conduit contribution in a federal campaign where a section 1001 violation does not also occur. Regardless of whether a defendant pleads guilty to a section 1001 violation or the substantive conduit contribution offense, it should make no difference in the sentence imposed. Indeed, this is precisely what is contemplated by the sentencing guidelines which cross-reference a violation of section 1001 involving campaign contributions back to §2C1.8, the guideline that deals specifically with violations of the Federal Campaign Act.

related to $63,200 in illegal campaign contributions in 2008, although the defendant Mobley was also involved in illegal campaign contributions of $8,300 in 2006 and $23,000 in 2007.[4] As a result of the $63,200 in total contributions in 2008, Mobley's advisory sentencing guidelines resulted in a total offense level of 12 with an imprisonment range of 10-16 months. Exh. B at pg. 3-4. Nevertheless, the district court imposed a sentence of three years probation on each count to run concurrently, 200 hours of community service, and a $200,000 fine. Comparatively, Mr. Odom's total offense level is 10 with a guideline range of 6-12 months. Accordingly, should this Court impose a sentence on Mr. Odom in excess of that given to defendant Mobley, it would create the very sentence disparity that §3553(a)(6) seeks to prevent.

Other examples where probation was imposed under similar or more aggravating circumstances than the case at bar include the following:

- *United States v. Snapper*, Case No.: 1:10-cr-00325-PLF (D.C. Dist. Ct.): The defendant pled guilty to one count of making false statements to the Federal Election Commission arising out of twenty-one illegal contributions of $2300 each to the Hillary Clinton for President Committee (total contributions of $48,300). Mr. Snapper was sentenced to three years probation and a fine of $3,000. (Exh. C).

- *United States v. Fermin Cuza*, 2:05-cr-00344 (C.D. Calif.): The defendant pled guilty to one count of submitting false statements to the FEC. The defendant was involved in making $102,214 in illegal campaign contributions. Mr. Cuza was sentenced to two years probation and a $500 fine. (Exh. D).

- *United States v. David Therrell Collier*, 1:07-cr-00182-RCL (D.C. Dist.Ct.): The defendant pled guilty to one count of making false statements to the FEC. The defendant was involved in making $66,500 in illegal conduit campaign contributions. Mr. Collier was sentenced to five years probation and a fine of $5,000. (Exh. E).

- *United States v. Jerry Pierce-Santos*, 1:09-cr-00014-EGS (D.C. Dist.Ct.): The defendant pled guilty to one count of making illegal conduit contributions. The defendant solicited ten individuals to make $2,000 in contributions to a federal candidate ($20,000 total in illegal campaign contributions) that were reimbursed by

---

[4] See United States' Sentencing Memorandum in Mobley at pg. 1-2 (Exh. B).

the defendant. Mr. Pierce-Santos was sentenced to three years probation, given credit for one day time served, with no fine imposed. (Exh. F).

Many conduit contribution cases, including those that satisfy the elements to be charged criminally, are resolved in civil actions before the Federal Election Commission ("FEC"). The following are examples of conduit contribution cases that are more aggravated than the one at bar that were the subject of FEC civil enforcement actions rather than criminal prosecution:[5]

> *In the matter of Apex Heathcare, Inc. and James Chao*, FEC MUR 5405 (2005): Respondents paid a civil penalty of $275,000 as a result of making approximately $80,000 in contributions in the names of others. (Exh. G).

> *In the matter of James M. Rhodes and Rhodes Design and Development Corp., et. al.*, FEC MUR 5305 (2005): Respondent Rhodes was a real estate developer who reimbursed campaign contributions of approximately $37,000. A civil penalty of $148,000 was imposed. (Exh H).

> *In the matter of Centex Construction Group, Inc., et al*, FEC MUR 5357 (2003): Multiple respondents engaged in a scheme to use a discretionary bonus program to reward political contributions in the approximate amount of $56,000. One group of respondents paid a civil penalty of $56,000. Other respondents who made contributions in the name of another received a civil penalty of $112,000. (Exh. I).

> *In the matter of Arlen B. Cenac, Jr., et al*, FEC MUR 6234 (2012): Respondent Cenac made approximately $40,300 in conduit contributions to federal campaigns. He received a civil penalty of $170,000. (Exh. J)

Mr. Odom understands that each case is different and must be evaluated based upon its own circumstances. The only point of the above analysis is that, in light of the relatively small amount of contributions for which Mr. Odom was charged, a probationary sentence would be more in line with sentences and penalties imposed in similar and more aggravated cases, whereas a sentence involving incarceration, confinement, or home detention would create an unwarranted disparity when compared to similarly situated defendants.

---

[5] FEC civil enforcement actions are referred to as Matters Under Review ("MURs"). To the best of our knowledge, none of the cases cited have resulted in criminal prosecution.

**III.     Conclusion**

Mr. Odom accepts responsibility for his involvement in the circumstances that led to the charges in this case. For the reasons stated above, we respectfully request that the Court impose a sentence of probation without confinement or home detention.

Respectfully Submitted,

 s/James P. Judkins
JAMES P. JUDKINS
Florida Bar No. 174168
jjudkins@readyfortrial.com
LARRY D. SIMPSON
Florida Bar No. 176070
lsimpson@readyfortrial.com
JUDKINS, SIMPSON, HIGH & SCHULTE
Post Office Box 10368
Tallahassee, Florida 32302-2368
(850) 222-6040; Fax No. (850) 561-1471
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this <u>17th</u> day of April, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Randall J. Hensel, AUSA at randy.hensel@usdoj.gov and Brian Kidd at Brian.Kidd2@usdoj.gov; Michael Constantakos, U.S. Probation Officer, was served by email at Mike_Constantakos@flnp.uscourts.gov.

 s/James P. Judkins
JAMES P. JUDKINS